IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| ANTONIO JOHNSON | § | PLAINTIFF |
| | § | |
| | § | |
| v. | § | Civil No. 1:17cv340-HSO-JCG |
| | § | |
| | § | |
| VT HALTER MARINE, INC., | § | |
| *et al.* | § | DEFENDANTS |

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION [88] FOR SUMMARY JUDGMENT
AND DISMISSING PLAINTIFF'S CLAIMS**

BEFORE THE COURT is the Motion [88] for Summary Judgment filed by

Defendants VT Halter Marine, Inc., David Newell, Russell Woodward, Cecil

Maxwell, and Zachary Anderson.[1] After due consideration of the record,

Defendants' Motion, and relevant legal authority, the Court is of the opinion that

Defendants are entitled to judgment as a matter of law, and their Motion [88]

should be granted.

---

[1] The title of the Motion [88] states that it is Defendant VT Halter Marine, Inc.'s Motion for Summary Judgment; however, all Defendants are represented by the same attorneys, and the Motion is signed on behalf of "Attorneys for Defendants." Defs.' Mot. [88] at 2. The Brief [89] also makes clear that all Defendants are seeking summary judgment. *See* Defs.' Br. [89] at 24 ("the defendants are entitled to summary judgment as a matter of law on all claims"); *see also id.* at 16-21 (arguing that claims against individual Defendants should be dismissed). Johnson received notice that all Defendants were seeking summary judgment, and he addresses his claims against the individual Defendants in his Memorandum. *See* Pl.'s Mem. [92] at 11-13. The Court will treat the Motion [88] for Summary Judgment as being filed on behalf of all Defendants.

BACKGROUND

A.    <u>Factual background</u>

1.    <u>Johnson's employment at VT Halter Marine, Inc.</u>

Defendant VT Halter Marine, Inc. ("VTHM") engages in the design and construction of commercial and military vessels, and at the times relevant to this lawsuit, it operated three shipyards in Pascagoula and Moss Point, Mississippi. Decl. of Stephenie Murray [88-4] at ¶ 1.[2]  These shipyards were known, respectively, as the Halter Moss Point shipyard, the Moss Point Marine shipyard, and the Halter Pascagoula shipyard.  *Id.*

From April 2010 to November 2012, Plaintiff Antonio Johnson ("Johnson" or "Plaintiff") worked at the Halter Pascagoula shipyard as a contract worker through a contract labor company called AmeriForce.  *Id.* at ¶ 4.  Johnson was a "Helper" and later became a "Tool Room Attendant" through AmeriForce.  *Id.*  In November 2012, Johnson was hired as a VTHM employee and assigned as a Tool Room Attendant at the Halter Pascagoula shipyard.  *Id.*  On September 1, 2014, Johnson was reassigned to the Moss Point Marine shipyard, and in mid-February 2015, he was moved back to the Halter Pascagoula shipyard as a Tool Room Repairer/Tool Room Attendant.  *Id.*

Throughout his employment at VTHM, Johnson worked in the Tool Room as either a Tool Room Attendant or a Tool Repairer.  *Id.* at ¶ 5.  Johnson's immediate

---

[2] Johnson has submitted this same Declaration in support of his opposition to Defendants' Motion.  *See* Decl. of Stephenie Murray [91-1] at 1.

2

supervisor was the Warehouse Manager, Mike Albert ("Albert"), who reported to VTHM's Vice President of Production, Hank Stewart ("Stewart"). *Id.*

2.  Johnson's termination

According to VTHM's Corporate Human Resources Manager Stephenie Murray ("Murray"), "during 2016 and 2017, VTHM was required to implement several reductions-in-force and shut down *both* the Halter Moss Point *and* Moss Point Marine shipyards during 2016, as the result of the completion of vessel projects and the lack of new vessel construction contracts to provide additional work." Decl. of Stephenie Murray [88-4] at ¶ 13 (emphasis in original). Murray avers that this was consistent with past practice on reductions in force, and that the procedure was to first determine those jobs that could be deemed non-essential and could be eliminated. *Id.* at ¶ 14. If more than one incumbent employee was in a job that could be eliminated during the reduction in force, VTHM then turned to the employee's seniority or hire date, unless an employee had any disciplinary or performance write-ups during the preceding year that might impact the decision. *Id.*

As part of the reduction in force, VTHM management made the decision to reduce the number of Tool Room Attendants at the Halter Pascagoula shipyard from three to two. *Id.* at ¶ 15. None of the three Tool Room Attendants, including Johnson, had any documented disciplinary or performance actions during the preceding year, but Johnson had the most recent hire date. *Id.* Accordingly, on March 5, 2017, VTHM made the decision to terminate Johnson as part of the

reduction in force. *Id.* Murray's Declaration states that some 20 other VTHM employees were terminated as part of the reduction before Johnson was terminated. *Id.* at ¶ 13. The reduction in force continued throughout 2017. *Id.* at ¶ 15.

Johnson was scheduled to be advised of his termination and released as part of the reduction in force on May 5, 2017. *Id.* at ¶ 16; Decl. of Iris Favre [88-5] at ¶ 9. Ultimately, Johnson was terminated a day earlier, on May 4, 2017, "because of an incident that involved his repeated *refusal* to perform a job assigned by his supervisor, Warehouse Manager Mike Albert." Decl. of Stephenie Murray [88-4] at ¶ 16 (emphasis in original).

According to Halter Pascagoula shipyard's Human Resources Manager Iris Favre ("Favre"), on May 4, 2017, Albert "came to Human Resources with Antonio Johnson and reported that he had directed Johnson several times to sort and inventory nuts and bolts that VTHM had in stock on consignment from a contractor," because Vice President of Production Hank Stewart ("Stewart") had requested an inventory before a scheduled meeting. Decl. of Iris Favre [88-5] at ¶ 9. Albert informed Favre that Johnson repeatedly refused to perform the job. *Id.* When Favre asked Johnson why he had refused, he "stated it wasn't his job to do so as a Tool Room Attendant," and he "insisted that the job should be performed by the contractor . . . ." *Id.*

Albert and Johnson then "became involved in a loud argument," and Favre went to Stewart's office to advise him of the situation. *Id.* After Albert reported to Stewart what had occurred, Stewart excused Albert and spoke with Johnson. *Id.*

Stewart "explained that the job was [Johnson's] to do as a Tool Room Attendant and that he was required to perform any job as directed by his supervisor," but "Johnson argued the point loudly." *Id.*

At that point, Stewart asked Favre to provide him with the VTHM Change of Status form documenting Johnson's termination as part of the reduction in force on May 5, 2017. *Id.* Stewart advised Johnson that he was scheduled to be terminated on that date but that he was terminating Johnson one day early due to his refusal to help sort the bolts as instructed. *Id.*; *see also* Change of Status [88-5] at 18 (effective date changed from 5/5/2017 to 5/4/2017). Murray declares that she and the Chief Executive Officer approved Johnson's termination. Decl. of Stephenie Murray [88-4] at ¶ 16.

VTHM hired "several employees, both before and after Johnson's termination, to meet specific needs to complete vessel construction," but those positions primarily consisted of skilled Electricians, Shipfitters, Specialty Welders, and Security Personnel. *Id.* at ¶ 17. According to Murray, from January 2017 through November 2018, VTHM did not hire any new Tool Room Attendants or Tool Room Repairers. *Id.*

3.    Johnson's complaints

In this case, Johnson alleges that he "endured numerous actions of discrimination" during his employment at VTHM, Am. Compl. [42] at 3, and that he was terminated in retaliation for "engag[ing] in the protected activity of voicing and filing a discrimination complaint with the Equal Employment Opportunity

Commission," *id.* at 4-5.  Johnson complains of separate incidents involving each of the individual Defendants, David Newell ("Newell"), Russell Woodward ("Woodward"), Cecil Maxwell ("Maxwell"), Nathan Shepard ("Shepard"),[3] and Zachary Anderson ("Anderson").  Based upon the record, it appears that the incidents giving rise to Plaintiff's claims occurred on the following dates:  (1) those with Shepard sometime between October 22, 2012, and September 7, 2013;[4] (2) those with Woodward on or before December 6, 2013;[5] (3) those with Maxwell on July 31, 2014, *see* Decl. of Iris Favre [88-5] at ¶ 3; (4) those with Anderson on October 14, 2014, *see* Employee Warning Notice [88-6] at 2; and (5) those with Newell on March 17, 2017, *see* Pl.'s Dep. [88-1] at 81.

Shepard resigned from VTHM on September 7, 2013; Woodward resigned on December 6, 2013; Maxwell resigned on February 29, 2015; and Anderson resigned on August 15, 2018.  Decl. of Stephenie Murray [88-4] at ¶ 9.  Johnson was

---

[3]  Based upon the employment records submitted by VTHM, it appears that Shepard's last name is spelled "Shepherd."  *See* Change of Status [88-5] at 8.  For purposes of this Order, the Court will utilize the spelling convention employed in the Amended Complaint—Shepard.  *See* Am. Compl. [42] at 1-2.

[4]  The Amended Complaint [42] does not allege on what date the incident involving Shepard occurred.  Nor have the parties directed the Court to any summary judgment evidence revealing a specific date.  The evidence VTHM has presented demonstrates that Shepard was hired on October 22, 2012, that he resigned effective September 7, 2013, and that the incident occurred sometime between those two dates.  *See* Decl. of Iris Favre [88-5] at ¶ 2; Change of Status [88-5] at 8; Decl. of Jim Ternyak [88-7] at ¶¶ 1-2.  Johnson did not complain to Human Resources about this incident.  Decl. of Iris Favre [88-5] at ¶ 2.

[5]  The Amended Complaint [42] does not assert, and there is no indication in the record, on what specific date the incident involving Woodward occurred.  Johnson's Memorandum [92] in opposition to summary judgment states only that it occurred in 2013.  *See* Pl.'s Mem. [92] at 6.  The competent summary judgment evidence reflects that Woodward resigned from VTHM on December 6, 2013, *see* Decl. of Stephenie Murray [88-4] at ¶ 9, such that the incident would have occurred at some point on or before that date.

terminated effective May 4, 2017.  Change of Status [88-5] at 18.

B.    Procedural background

Johnson filed a Charge of Discrimination with the Equal Employment

Opportunity Commission ("EEOC") on or about May 27, 2017.  EEOC Charge [88-1]

at 53.  He alleged that he was subjected to race and sex discrimination and to

retaliation.  *See id.*  Johnson provided a statement regarding his employment and

discharge, indicating that he was hired by VTHM in April 2010, and that on March

17, 2017, a superintendent referred to him by using a racial epithet.  *Id.*  According

to Johnson's written statement, that incident

> was reported and [the superintendent] supposedly was suspended for
> three days.  Policy states "no tolerance" for discrimination.  I felt that
> my safety was threatened.  On May 4, 2017, I was laid off.
>
> Superintendent David Newell
>
> Management said it was a reduction in force.  But we been [sic] hiring
> people for weeks, even same week I was let go.
>
> I believe I was subjected to a hostile environment because of my race
> (black) and laid off because of my race (black) and sex (male) and in
> retaliation for reporting the harassment/discrimination in violation of
> Title VII of the Civil Rights Act of 1984, as amended.  There [illegible]
> females who were not laid off, which one had a write-up.  I never was
> written up, never.  They [sic] also were some employees with more
> missed time than me, even my [illegible] boss man Mike Albert.  Also
> were [sic] late more than I was, which all plays a factor in during lay-
> offs.

*Id.*

The EEOC subsequently provided Johnson with a Notice of Right to Sue, and

he timely filed this lawsuit on December 11, 2017.  Johnson filed an Amended

Complaint [42] on May 29, 2018, which is the operative pleading.  The Amended

Complaint names VTHM, Newell, Woodward, Maxwell, Shepard, and Anderson as Defendants. Johnson's claims against Shepard were subsequently dismissed without prejudice pursuant to Federal Rule of Civil Procedure 4(m). *See* Order [87] at 4.

Johnson advances claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, against VTHM for hostile work environment and retaliatory discharge, *see* Am. Compl. [42] at 5-7, and against all Defendants for intentional race discrimination and retaliatory discharge under 42 U.S.C. § 1981, *id.* at 7-8. Defendants' Motion [88] for Summary Judgment asserts that there are no disputed issues of material fact and that they are entitled to judgment as a matter of law on Johnson's claims. With respect to Johnson's claims against the individual Defendants under § 1981, Defendants argue that there is no individual liability under that statute, such that these claims are insufficient as a matter of law. Defs.' Br. [89] at 17-18.[6]

With respect to Johnson's hostile work environment claims against VTHM, Defendants maintain that these claims are "based exclusively on Newell's *one* alleged racial comment in May 2017," Defs.' Br. [89] at 19 (emphasis in original), and that this one comment was not sufficiently severe or pervasive to alter the terms and conditions of Johnson's employment or to create an abusive working

---

[6] Because Defendants employ a cover page on their Brief [89], that document's pagination differs from the Court's automatically-generated page numbers in its Case Management/Electronic Case Files ("CM/ECF") system. Throughout this Order, the Court will refer to the CM/ECF page numbers.

environment, *id.* (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 558 (5th Cir. 2007)).  Defendants maintain that when Johnson complained to Human Resources about Newell's alleged comment, "VTHM promptly investigated and indisputably took prompt effective corrective action," and that there was no subsequent racial harassment, precluding Johnson's hostile work environment claim.  *Id.* at 21.

As for Johnson's retaliatory discharge claim against VTHM, Defendants argue that even if Johnson has produced sufficient circumstantial evidence to support a prima facie case of retaliation, "VTHM has produced uncontroverted evidence to establish that Johnson's termination was part of ongoing economic reductions-in-force during 2016 and 2017."  *Id.* at 23.

## II. <u>DISCUSSION</u>

### A.   <u>Summary judgment standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the movant carries this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that there exists a genuine issue of material fact.  *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).  "A genuine dispute of material fact means that evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC&R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quotation omitted).  If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate.  *Cutting Underwater Techs. USA, Inc. v. ENI U.S. Operating Co.*, 671 F.3d 512, 516 (5th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  In deciding whether summary judgment is appropriate, the Court views facts and inferences in the light most favorable to the nonmoving party.  *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 858 (5th Cir. 2010).

B.     Johnson's § 1981 claims against the individual Defendants

        42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a).  The statute defines the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  "The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."  42 U.S.C. § 1981(c).

        The United States Court of Appeals for the Fifth Circuit has recognized that "there is a tension" in its § 1981 jurisprudence between its decisions in *Bellows v. Amoco Oil Co.*, 118 F.3d 268 (5th Cir. 1997), and *Oden v. Oktibbeha County, Miss.*, 246 F.3d 458 (5th Cir. 2001), "with respect to the liability of individual defendants

who are not parties to the employment contract." *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 338 (5th Cir. 2003); *see also Jones v. City of Houston*, 756 F. App'x 341, 348 (5th Cir. 2018) (recognizing the "tension" and stating "we do not actually decide whether § 1981 claims are cognizable against government officials in their individual capacities.") (citing *Foley*, 355 F.3d at 338).

To the extent an individual defendant who is not a party to an employment contract cannot be held liable under § 1981, Johnson's claims against the individual Defendants would be subject to dismissal on that basis. None of the individual Defendants here were Johnson's supervisors, and he has not presented competent summary judgment evidence tending to show that any of the individual Defendants were parties to his employment contract with VTHM. *See Foley,* 355 F.3d at 337 (citing *Felton v. Polles*, 315 F.3d 470, 481 (5th Cir. 2002)). However, in light of the "tension" in the Fifth Circuit authority on this issue, *see id.*, out of an abundance of caution the Court will consider Johnson's § 1981 claims against the individual Defendants on their merits. Because employment discrimination claims brought under 42 U.S.C. § 1981 "are analyzed under the evidentiary framework applicable to claims arising under Title VII," *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999), the Court will consider Johnson's § 1981 and Title VII claims together.

C.    The merits of Johnson's Title VII and § 1981 claims

Johnson claims that he is a member of a protected class and that VTHM subjected him to actions creating a hostile working environment because of his race,

in violation of Title VII. Am. Compl. [42] at 6. Johnson also advances a Title VII retaliatory discharge claim against VTHM, *see id.* at 6-7, and claims that all Defendants intentionally discriminated against him and created a hostile work environment in violation of § 1981, *id.* at 7-8. Finally, Johnson raises a retaliatory discharge claim against all Defendants under § 1981. *Id.* at 7-8.

1.   Hostile work environment claims

In order to support a claim for a hostile working environment under either Title VII or § 1981, a plaintiff must prove that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). For harassment based on race to affect "a term, condition, or privilege of employment," it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

a.   Johnson's claims against Woodward, Maxwell, and Anderson

Defendants Woodward, Maxwell, and Anderson argue that Johnson cannot show that any alleged harassment by these individuals was based on race. *See* Defs.' Br. [89] at 18. Defendants point out that Johnson never complained about any of the incidents involving these three Defendants, and no evidence has been

submitted to show that Johnson's race played any part in the episodes involving these three Defendants. *Id.* Defendants maintain that for this reason alone, Woodward, Maxwell, and Anderson are entitled to dismissal of the hostile work environment claims. *Id.*[7]

In opposition to Defendants' request for summary judgment, Johnson refers to a single incident that occurred between him and each Defendant. The Court will address each alleged incident separately.

(1)   Incident with Woodward

With respect to Woodward, Johnson refers to a single incident that occurred in 2013, when Woodward "used profanity towards Johnson, which Johnson then reported to HR Manager Iris Favre." Pl.'s Mem. [92] at 6-7. Johnson relies upon his own deposition testimony to support this allegation. *See id.*

> Johnson testified that Woodward came to the tool room
>
> from the fab shop wanting something that he couldn't have. No matter
> about being a white hat or not, I couldn't give it to him. And [Woodward]
> just went off on me and Ms. Vicki Johns. [8]

Pl.'s Dep. [91-2] at 146-47. Johnson agreed that Woodward used profanity because Johnson would not give Woodward the item Woodward wanted. *Id.* at 147.

---

[7] Johnson counters that he has produced sufficient evidence to survive summary judgment against all individual Defendants, and he relies in his brief upon a racial epithet used by supervisor Defendant Newell. *See* Pl.'s Mem. [92] at 11. As for Maxwell, Anderson, and Woodward, it is unclear how an individual employee could be held liable for a comment made by a different employee, during an incident with which they bore no connection. Johnson has not cited any competent evidence that Woodward, Maxwell, or Anderson was present when this alleged comment was made or that they had any involvement in the incident leading up to it.

[8] Johns was also a Tool Room Attendant. Pl.'s Dep. [91-2] at 147.

Johnson claims that Woodward exhibited hostility and posits that he "shouldn't have to be subjected to be [sic] cursed out and things like that for me simply doing my job." *Id.* Johnson could not "recall any other complaints" about Woodward. *Id.* at 147; *see* Pl.'s Dep. [88-1] at 149 ("That's the only incident I can remember happening with [Woodward]"). Woodward resigned from VTHM on December 6, 2013. *See* Decl. of Stephenie Murray [91-1] at ¶ 9.

      (2)   <u>Incident with Maxwell</u>

In opposition to Defendants' request for summary judgment, Johnson refers to an incident which purportedly occurred in late July 2014, during which Maxwell threw a "brass washer" at Johnson. Pl.'s Mem. [92] at 5. In presenting his version of the facts in his Memorandum, Johnson does not cite to the record or indicate where any evidence supporting his argument may be located.

Johnson did discuss the alleged incident involving Maxwell in his deposition. *See* Pl.'s Dep. [88-1] at 142. According to Johnson, the item Maxwell threw at him was a "little brass washer." *Id.* Johnson described the incident as follows:

> I don't know the date, but [Maxwell] was clearing an employee out. And the rules are, when employees come, they have to turn in anything that Halter gave them. And the employee was turning all this stuff in. He put his brass washer on the counter, which is what he was supposed to do. Cecil [Maxwell] reached over him, got the brass washer from off the counter. Cecil already knew that we have to take those in.
>
> So I told him, I'm going to have to have that brass washer. He said he was going to take it to his foreman and his foreman can bring it back up there, which makes no sense because it's already where it's supposed to be.
>
> So I told him I was not going to write the employee that was being laid off a gate pass unless I got that brass washer. He got mad and threw it back in the window. It hit the side of the wall and it landed on the counter.

*Id.* at 142-43.  Johnson acknowledged that the washer did not hit him.  *Id.* at 143.

Johnson verbally reported this incident to Favre, VTHM's Human Resources Manager at the Halter Pascagoula shipyard, but he did not want to file a formal complaint.  *Id.*; *see also* Decl. of Iris Favre [88-5] at ¶ 3.  Maxwell was instructed to apologize to Johnson, which he did, but Johnson contends that the apology was not sincere.  Pl.'s Dep. [88-1] at 144-45.  According to Johnson, Maxwell stated that he was only apologizing because he was told to do so.  *Id.* at 145.  Johnson could not recall any other incidents involving Maxwell, *id.*, who resigned from VTHM on February 29, 2015, Decl. of Stephenie Murray [91-1] at ¶ 9.

According to Favre, Maxwell maintained that he did not throw the washer at Johnson but tossed it on the window counter and left.  Decl. of Iris Favre [88-5] at ¶ 3.  Maxwell "did not mean anything by it," *id.*, and "Johnson never suggested to [Favre] or to [her] knowledge anyone else that he believed his race (African American) played any part in the episode," *id.*

(3)     Incident with Anderson

Johnson claims that at some point while he was the Tool Room Attendant at the Moss Point Marine shipyard, Anderson, who was a Shipfitter Lead, "threw a torch tip and soapstone at him, striking him."  Pl.'s Mem. [92] at 5.  Johnson cites nowhere to the record to support his version of the event.  *See id.* at 5-6.  Based upon the Court's review of the record, it appears that Johnson testified during his deposition that on or about October 15, 2014, Anderson threw a "tip" for a welding torch at him, after Anderson thought Johnson had called him a child.  Pl.'s Dep. [88-

1] at 151, 153-54. Johnson estimated the tip to be about two inches long and "about bigger than somewhere close to" the width of a pen. *See id.* at 151.

At the time of this incident, Sherry Henry, formerly Sherry Poole ("Henry"), was the Human Resources Manager at the VTHM Moss Point Marine shipyard. Decl. of Sherry Henry [88-6] at ¶ 1. Henry testified as one of VTHM's Federal Rule of Civil Procedure 30(b)(6) designees that, during this same incident, Anderson threw a soapstone through a window at Johnson. VTHM's Rule 30(b)(6) Dep. [88-2] at 33. A soapstone is used to write on the metal on ships and is "real lightweight." *Id.* According to Henry, although Johnson testified that Anderson hit him, Henry did not recall Johnson ever saying during the investigation that these items hit him. *Id.* at 35. Henry's Declaration avers that Johnson "never complained that any employee mistreated, harassed or discriminated against him because of his race (African American)." Decl. of Sherry Henry [88-6] at ¶ 2.

Henry has submitted the statements she obtained from Anderson, Johnson, and two other witnesses during her investigation of the incident. According to Johnson's statement [88-6], the incident involved whether a third employee could obtain a torch tip without a "white hat," meaning a supervisor. *See* Pl.'s Statement [88-6] at 10-11. When Anderson arrived, he told Johnson that "[i]t's common sense that if a guy turns a torch in with a tip he [sic] going to need one back." *Id.* "[A]fter things started getting worse," Johnson told Anderson "he needed to get his young self away from this window his lil 20 something year old self away from here disrespecting me cause I'm doing my job." *Id.* Johnson alleges that Anderson then

"decided that wasn't enough drama so he boldly called me <u>ignorant</u> by stated [sic] 'you're not the first ignorand [sic] person I had to deal with.'" *Id.* (emphasis in original). Before Anderson walked away, he "threw the box of soapstone that was sitting in the window and the tip [Johnson] just gave him back in the window at [Johnson]." *Id.* Anderson received a verbal warning for this incident on October 16, 2014. *See* Warning [88-6] at 2. He subsequently resigned from VTHM on August 15, 2018. Decl. of Stephenie Murray [91-1] at ¶ 9.

> (4) <u>Plaintiff's hostile work environment claims against Woodward, Maxwell, and Anderson, individually</u>

Construing the record evidence in Johnson's favor, even if Defendants Woodward, Maxwell, and Anderson acted in the manner that Johnson alleges, Johnson has not presented sufficient competent evidence to survive summary judgment on his hostile work environment claim against these three Defendants. The record contains evidence of a single, isolated incident involving each Defendant, and Johnson has not shown that any of these incidents had any connection to his race, or that any incident was sufficiently serious to create a hostile work environment.

Even if Johnson was subjected to unwelcome harassment by Woodward, Maxwell, or Anderson that affected a term, condition, or privilege of employment, Johnson has not presented any evidence tending to show that the harassment complained of was based on his race. *See Ramsey*, 286 F.3d at 268. Uncivil actions in the workplace that do not affect a term, condition, or privilege of employment, or that are not based upon race or some other protected characteristic, are simply not

17

actionable under either Title VII or § 1981. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("Title VII . . . does not set forth 'a general civility code for the American workplace.'") (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Johnson's hostile work environment claims against individual Defendants Woodward, Maxwell, and Anderson should be dismissed.

      b.    <u>Johnson's claims against VTHM and Newell</u>

Johnson also advances hostile work environment claims against VTHM and Newell individually. In support of these claims, he alludes to the previously-discussed incidents involving Woodward, Maxwell, Anderson, and one involving Shepard. *See* Pl.'s Mem. [92] at 12 (referring to "the Woodward episode"). As for Shepard, Johnson claims that, sometime before September 7, 2013, Shepard "threw two pairs of earplugs at Mr. Johnson because he was following proper protocol mandated within the Tool Room" of the Halter Pascagoula shipyard. Pl.'s Mem. [92] at 4; *see also* Pl.'s Dep. [88-1] at 131-32, 133-34. According to Johnson, he "was doing [his] job" when Shepard

> come asking for something that they wasn't allowed to get, and he got a little upset, and threw something back in the window at [Johnson].
> .  .  .
> Because [Shepard] couldn't get a box of earplugs, he got mad.

Pl.'s Dep. [88-1] at 134. Johnson testified in his deposition that, while Shepard was a "lead" and wanted to take earplugs to his employees, Johnson could not provide Shepard with a box of earplugs as requested because Shepard was not a superintendent or a supervisor. *Id.* at 135-36.

After Shepard threw the earplugs at Johnson, Johnson climbed through the

Tool Room window and followed Shepard out into the shipyard. *Id.* at 140. Johnson told Shepard "don't throw at me again" and explained that he has "to listen to what [his] boss man tell[s] me to do just like you all." *Id.*

Johnson did not complain to Human Resources about the incident with Shepard. *Id.* at 135. Instead, Johnson informed his immediate supervisor Mike Albert of the incident, and Albert "got with Jim Turniak," who was either the pipefitter foreman or supervisor. *See id.* at 134-35. Subsequently, Turniak and Shepard came to the Tool Room. *Id.* at 141. Shepard and Johnson "shook hands [and] apologized," *id.*, and Johnson did not recall another incident with Shepard after that, *id.* Shepherd resigned from VTHM on September 7, 2013. *See* Decl. of Stephenie Murray [88-4] at ¶ 9.

Johnson also claims that he was subjected to unwelcome harassment because of his race when Newell referred to him using a racial epithet. *Id.* (emphasis in original). The incident involving Newell occurred on or about March 17, 2017, while Newell was a superintendent for the electrical department at the Halter Pascagoula shipyard. Pl.'s Dep. [88-1] at 80-81. He was not Johnson's supervisor. *Id.*; *see also* Decl. of Stephenie Murray [88-4] at ¶ 11. Johnson, Newell, and two other witnesses provided statements to human resources about what occurred, but the witnesses disagreed as to what phrase Newell used. *Compare* Pl.'s Statement [88-5] at 12 and Terry Davis's Statement [88-5] at 13, *with* Scott Brown's Statement [88-5] at 15 and Newell's Statement [88-5] at 16.

Johnson's version of the incident was that an employee named Scott Brown

("Brown") approached his window in the Tool Room needing a rope, and Johnson informed Brown that he would need a supervisor to obtain the item. Pl.'s Statement [88-5] at 12. Brown called his own supervisor, Newell, on speakerphone to get the necessary approval in Johnson's hearing, and during Brown's conversation with Newell, Newell allegedly referred to Johnson by using a racial epithet. *Id.*

    (1)    <u>Prima facie case of hostile work environment</u>

In order to support a claim for a hostile working environment under either Title VII or § 1981, a plaintiff must prove that the harassment complained of was based on race. *See Ramsey,* 286 F.3d at 268. To the extent Johnson relies upon the individual incidents involving Maxwell, Anderson, Shepard, and Woodward in order to attempt to establish a prima facie case of hostile work environment against either Newell individually or VTHM, the record contains insufficient evidence from which a reasonable jury could conclude that those individuals' actions were based upon race or any animus related to Johnson's race. Nor is there evidence that these alleged incidents were part of a pattern of race-based harassment. Therefore, the Court need not consider these incidents in determining whether Johnson was subjected to a hostile work environment by Newell or VTHM. *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 654 (5th Cir. 2012). The Court will only consider the actions of Newell, which is the only other incident referenced in the summary judgment record, in determining whether Johnson has established a prima facie hostile work environment claim against Newell or VTHM.

To establish a hostile work environment claim, a plaintiff must show harassment based on race that affected "a term, condition, or privilege of employment," meaning that it was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ramsey*, 286 F.3d at 268 (quotation omitted). In *Hernandez,* one plaintiff "was called a racially derogatory term on one occasion and once saw a poster or letter that was derogatory about Hispanics." 670 F.3d at 652. The other plaintiff "once heard Mexicans referred to in a derogatory manner over a company radio and had seen a discriminatory posting or drawing." *Id.* According to the Fifth Circuit, "[i]f in fact only two incidents such as these occurred over a ten-year period, this would not create a fact issue that the harassment was 'sufficiently severe or pervasive' such that 'an abusive working environment' had been shown." *Id.*

*Hernandez* is instructive. In this case, Johnson worked at a VTHM shipyard for more than seven years, from April 2010 through May 4, 2017, beginning as a contract worker. Decl. of Stephenie Murray [88-4] at ¶¶ 4, 16. He was an employee of VTHM from November 2012 until his termination in May 2017. While the racial epithet, if actually used by Newell over the speakerphone to another employee while in Johnson's hearing, is certainly offensive and always highly inappropriate, Johnson has not directed the Court to any competent summary judgment evidence tending to show that this single, isolated incident was sufficiently severe or pervasive to create an abusive working environment. *See Hernandez*, 670 F.3d at 652. Because Johnson has not created a fact issue on this element of his hostile

work environment claim, Newell and VTHM are entitled to summary judgment.

(2)   VTHM's prompt remedial action

Even if Johnson has established a prima facie case of hostile work environment, VTHM argues that it "promptly investigated and indisputably took prompt effective corrective action, *notwithstanding* the fact that Newell's racial comment was *disputed.*" Defs.' Br. [89] at 21 (emphasis in original).

According to the Fifth Circuit, "[a] defendant may avoid Title VII liability when harassment occurred but the defendant took 'prompt remedial action' to protect the claimant." *Williams-Boldware v. Denton Cty., Tex.*, 741 F.3d 635, 640 (5th Cir. 2014) (quoting *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 329 (5th Cir. 2004)). "What constitutes prompt remedial action is a fact-specific inquiry and 'not every response by an employer will be sufficient' to absolve the employer of liability under Title VII." *Id.* (quoting *Hockman*, 407 F.3d at 329). "An employer may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not reasonably calculated to halt the harassment." *Id.*

In this case, after Johnson complained to Human Resources, Favre advised Johnson that he and witness Terry Davis needed to write statements describing what had occurred. Decl. of Iris Favre [88-5] at ¶ 4. Favre then directed Henry to obtain statements from Newell and Brown, which were supplied to Favre, *id.* at ¶ 5, and these materials were submitted to Murray, *id.* at ¶ 7.

Murray reviewed the investigation summaries and statements with Vice President of Production Hank Stewart, who was Newell's immediate supervisor,

and with the chief executive officer ("CEO") of VTHM.  Murray also provided the two executives with additional information indicating that Favre and Henry had stated that Johnson promptly reported his complaint and appeared to be upset and distressed when he did so.  Decl. of Stephenie Murray [88-4] at ¶12.  Murray reviewed Newell's employment record and advised Stewart and the CEO that there were no previous complaints of any kind against Newell.  *Id.*  The three agreed that the evidence was inconclusive but that Newell should be disciplined with a three-day suspension without pay and a written warning.  *Id.*  Newell was also required to sign a new acknowledgement form to confirm that he had read, understood, and agreed to fully comply with VTHM's Equal Employment Opportunity/Harassment Policy.  *Id.*

Every indication from the record is that VTHM took prompt remedial action that was reasonably calculated to halt any harassment, and Johnson has not pointed to any evidence which disputes these facts.  For this reason as well, summary judgment is appropriate on Johnson's hostile work environment claim against Newell and VTHM.  *See, e.g., Williams-Boldware*, 741 F.3d at 640.

2.      Johnson's retaliatory discharge claims

The Amended Complaint [42] alleges that "[a]s a result of filing discrimination charges against Defendants, Plaintiff feels his employment was terminated."  Am. Compl. [42] at 4.  Johnson asserts that he

> was discriminated and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended, because he was engaged in the protected activity of voicing and filing a discrimination complaint with the Equal Employment Opportunity Commission.  As a result of filing

23

discrimination charges against Defendants, Plaintiff's employment was terminated.

*Id.* at 4-5. VTHM "retaliated against Plaintiff after he made reports of discrimination to the EEOC," and allegedly "unjustly subject[ed] him to unjust scrutiny, exclusion, and termination." *Id.* at 6-7. Johnson further asserts that "Defendants, agents, and employees of Defendants, retaliated against Plaintiff after he made reports of intentional discrimination to the EEOC." *Id.* at 8.[9]

In order to establish a prima facie case of retaliation, a plaintiff must demonstrate that: "(1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action." *Thomas v. Tregre*, 913 F.3d 458, 463 (5th Cir. 2019), *as revised* (Jan. 25, 2019) (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007) (per curiam)). A relatively short gap in time between a complaint and an adverse employment action can support a causal connection at the summary judgment stage. *See, e.g., Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (finding five days to be sufficiently close to provide the causal connection required to make out a prima facie case of retaliation, but noting that "a time lapse of up to four

_____

[9]  Johnson was discharged on May 4, 2017, before he signed his EEOC charge on May 27, 2017. *See* Charge [88-1] at 40. There is no indication in the summary-judgment record of any additional complaints Johnson made to the EEOC. Since the EEOC charge was not filed until after Johnson's termination, it is unclear from the Amended Complaint what protected activity Johnson claims he engaged in that led VTHM to terminate him. In opposition to summary judgment, Johnson opines that he was retaliated against for making complaints to VTHM's Human Resources department and by displaying interest in filing an EEOC charge. Each of these scenarios will be discussed in analyzing Johnson's retaliatory discharge claims against VTHM.

months has been found sufficient to satisfy the causal connection for summary judgment purposes") (quoting *Weeks v. NationsBank, N.A.*, No. CIV.A.3:98-CV-1352M, 2000 WL 341257, at *3 (N.D. Tex. 2000)); *see also, e.g., Johnson v. Halstead*, 916 F.3d 410, 421 (5th Cir. 2019) (holding that, on a motion for judgment on the pleadings, three-month gap between complaints of discrimination and allegedly adverse transfer support an allegation that the two events were related at pleading stage).

If the employee establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its decision. *Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (quotation omitted). "The employer's burden is one of production, not persuasion, and does not involve a credibility assessment." *Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 259 (5th Cir. 2011).

If the employer states such a reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation. *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 427 (5th Cir. 2017), *reh'g denied* (Apr. 27, 2017); *Feist*, 730 F.3d at 454. To show pretext, the employee must produce evidence that could lead a reasonable factfinder to conclude that the adverse employment action would not have occurred "but for" the employee's decision to engage in protected activity. *Alkhawaldeh*, 851 F.3d at 427. Although close timing between a protected activity and an adverse employment action may be sufficient to establish a prima facie case alone, it is insufficient to create a fact issue at the

pretext stage if an employer has stated a non-retaliatory reason for its decision. *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 220 (5th Cir. 2016) (citing *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 487 (5th Cir. 2008)).

    a.    <u>Individual Defendants</u>

Even assuming Johnson can pursue a § 1981 retaliatory discharge claim against the individual Defendants, they have presented evidence that two of the remaining individual Defendants, Woodward and Maxwell, were no longer employed by VTHM when the decision to terminate Johnson's employment was made. *See* Decl. of Stephenie Murray [88-4] at ¶ 9.[10]  Moreover, there is no competent summary judgment evidence from which a reasonable jury could conclude that Anderson or Newell played any part whatsoever in the decision to terminate Johnson. *See generally id.* at ¶¶ 13-16 (discussing the reductions-in-force and Johnson's termination); Decl. of Iris Favre [88-5] at ¶¶ 8-9 (same).  Johnson has not presented any evidence tending to show that any of the individual Defendants took an adverse employment action against him.  He cannot establish a prima facie case of retaliatory discharge against any of these Defendants, and his retaliatory discharge claims against the individual Defendants should be dismissed.

---

[10]  Defendants contend that Woodward, Maxwell, Shepard, and Anderson "were no longer employed by VTHM when the decision was made to terminate Johnson's employment as part of the ongoing reductions-in-force . . . ." Defs.' Br. [89] at 17.  However, the record evidence reflects that Anderson did not resign until August 15, 2018, Decl. of Stephenie Murray [88-4] at ¶ 9, which would have been after Johnson's May 4, 2017, termination, *id.* at ¶ 16.  Shepard is no longer a Defendant in this case.  *See* Order [87] at 4.

b.     VTHM

The Amended Complaint asserts that VTHM retaliated against Johnson by terminating him because he made reports of discrimination to the EEOC. *See* Am. Compl. [42] at 6-7. The only EEOC charge in the record was signed by Johnson on May 27, 2017, after he had already been discharged on May 4, 2017. *See* Charge [88-1] at 40. Johnson cannot show a causal connection between the protected activity of reporting discrimination to the EEOC and his termination.

To the extent Johnson maintains that he was terminated in retaliation for his complaints to VTHM's Human Resources department, VTHM does not dispute that Johnson can make out a prima facie case of retaliatory discharge. *See* Defs.' Br. [89] at 22-23. Instead, VTHM argues that it "has produced uncontroverted evidence to establish that Johnson's termination was part of ongoing economic reductions-in-force during 2016 and 2017," which it argues constituted a legitimate non-retaliatory reason for the termination. *Id.* at 23.

VTHM has proffered legitimate, non-retaliatory reasons for its decision; thus, the burden shifts back to Johnson to demonstrate that VTHM's reason is actually a pretext for retaliation. *See Alkhawaldeh*, 851 F.3d at 427; *Feist*, 730 F.3d at 454. Johnson has not done so. Viewing all of the facts in a light most favorable to Johnson, there is no competent evidence that could lead a reasonable factfinder to conclude that Johnson's termination would not have occurred "but for" his decision to engage in protected activity. *See Alkhawaldeh*, 851 F.3d at 427. Any temporal proximity between Johnson's complaints about Newell and his termination is

insufficient by itself to create a genuine dispute of material fact as to pretext. *See Outley*, 840 F.3d at 220; *Aryain*, 534 F.3d at 487.

Johnson attempts to show that his supervisor viewed him as the most competent worker in the Tool Room, and that he did not receive as many complaints as the other workers, such that he should not have been terminated as part of the reduction in force. *See* Pl.'s Mem. [92] at 13-15. VTHM has explained its non-retaliatory criteria for determining who would be terminated. Johnson has not produced competent evidence tending to show that VTHM did not in fact follow these criteria,[11] and his arguments that VTHM's criteria should have been different are not enough to show pretext. Even if VTHM erroneously applied its chosen criteria, a mere mistake is not sufficient to establish pretext. *See Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995). "The question is not whether an employer made an erroneous decision; it is whether the decision was made with [retaliatory] motive." *Id.*

Johnson also argues that he displayed an interest in pursuing an EEOC claim related to the incident with Newell when he requested his file from the

---

[11] One of the criteria VTHM used for the reduction in force was seniority or hire date, unless an employee had any disciplinary or performance write-ups during the preceding year that may impact the decision. Decl. of Stephenie Murray [88-4] at ¶ 14. In Johnson's Memorandum, he argues that one of the other Tool Room Attendants "had a disciplinary write-up that was disclosed to Johnson by Mike Albert himself." Pl.'s Mem. [92] at 14 (citing Pl.'s Dep. [91-2] at 103). Even if this worker received such a write-up, Johnson does not allege that the write-up occurred within the preceding year, which was VTHM's stated criteria. *See* Decl. of Stephenie Murray [88-4] at ¶ 14. Nor is there any competent summary judgment evidence showing that any such write-up occurred within one year of the decision regarding the reduction in force. The evidence presented by VTHM reflects that none of the three Tool Room Attendants had any documented disciplinary or performance actions during the year preceding the termination decision. *Id.* at ¶ 15.

Human Resources department prior to his termination, but his request was refused. Pl.'s Mem. [91] at 13 (citing Pl.'s Dep. [91-2] at 127-28). As such, he contends that based upon this incident, "VTHM had motive to get rid of Johnson." *Id.* According to Johnson, Favre did not refuse to allow him to view his personnel file, but instead informed him that he would need to schedule an appointment to review his personnel file in the office, rather than simply remove the documents and take them with him. Pl.'s Dep. [91-2] at 127-28.

The portion of the record cited by Johnson is devoid of any indication that he ever informed Favre or anyone else at VTHM of his intention to file an EEOC charge. While Johnson speculated in his deposition that requiring him to make an appointment would give Favre "ample enough time if something is in [Johnson's personnel file] that's not supposed to be in there to come out," *id.* at 128, there is no allegation or indication that anything was removed from Johnson's personnel file. Nor does Johnson cite any other evidence to show that the potential for an EEOC charge played a role in VTHM's decision to terminate him.

In sum, Johnson has not created a material fact question regarding whether VTHM had a retaliatory motive when it decided to terminate him as part of its reduction in force. Summary judgment is appropriate.[12]

---

[12] Johnson cites only one case in the section of his Memorandum [92] involving his retaliatory discharge claims against VTHM for the proposition that "[a] plaintiff can prove a continuing violation either by producing evidence of a series of discriminatory acts or by demonstrating that the defendant has a policy of discriminating." Pl.'s Mem. [92] at 14 (citing *Waltman v. Int'l Paper Co.*, 875 F.2d 468 (5th Cir. 1989)). Defendants have not argued that Johnson's claims are time-barred, so it is unclear why he raises the continuing-violation doctrine.

### III. CONCLUSION

Because Defendants have shown that there is no genuine dispute of material fact for resolution at trial and that they are entitled to judgment as a matter of law on Johnson's claims, summary judgment should be granted, and this case will be dismissed. To the extent the Court has not specifically addressed any of the parties' arguments, it has considered them and determined that they would not alter the result.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, the Motion [88] for Summary Judgment filed by Defendants VT Halter Marine, Inc., David Newell, Russell Woodward, Cecil Maxwell, and Zachary Anderson is **GRANTED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Plaintiff Antonio L. Johnson's claims against Defendants VT Halter Marine, Inc., David Newell, Russell Woodward, Cecil Maxwell, and Zachary Anderson are **DISMISSED WITH PREJUDICE**. A separate judgment will be entered in accordance with Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED** this the 24th day of September, 2019.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE